My name is Hector Viagra. I'm here on behalf of the Plaintiff Appellants. I'm joined at council table by Thomas Saenz and in the gallery by co-counsel Daniel Ortega and Thomas Hudson. Your Honors, this Court will reverse a denial of a preliminary injunction if the district court misapprehended the law with respect to the underlying issues in the litigation. In other words, if the district court got the law wrong or relied on erroneous legal premises. Here, the district court fundamentally misapprehended the law. The district court misunderstood and misapplied each of the three tests of preemption that the Supreme Court laid out in Dekanis. First and foremost, the court incorrectly framed the question whether Proposition 200 is an unconstitutional regulation of immigration. The court framed the question in terms of Proposition 200's purported adoption of federal standards and the delegation of federal power. But as the Supreme Court has made emphatically clear, the power to regulate immigration is unquestionably exclusively a federal power. Any state statute that regulates immigration is prescribed, and Congress has no power to authorize or approve state regulation of immigration. Therefore, the court relied on the erroneous legal premise that Congress could authorize regulation of immigration. And the court's error could not be more explicit on this point, Your Honors. At page 11 of the court's order, the court admitted, quote, if the court were to follow the decision in LULAC v. Wilson, LULAC 1, 908 FSUP 755, which found several provisions of California's Proposition 187 to be preempted by federal immigration law, Proposition 200's verification and reporting provisions would directly regulate immigration by creating a comprehensive scheme to detect and report the presence and effect the immigration law was decided before the enactment of the PRA, thereby distinguishing it from the present case. That, Your Honors, is patently wrong. The Constitution prescribes state regulation of immigration, and Congress has no power to authorize or approve it. Therefore, the PRA, the Personal Responsibility Act, can have no bearing on the first test of preemption. Proposition 200 either regulates immigration or it doesn't. And the district court found that it did. That should have been the end of the court's analysis. Second, in applying the field preemption test, the district court misread Congress's careful designation of the limited instances in which states had power to set alien eligibility for benefits. The court mistook these as evidence of Congress's intent to allow states to legislate throughout the entire field, and including specifically the areas of verification and reporting. This legal error not only turns the field preemption doctrine on its head, it turns exceptions from the general rule into the general rule. It violates the most basic tenets of statutory construction, and it eviscerates any notion of implied preemptive intent. Third, the district court improperly violated the conflict preemption test. The court applied only one prong of the test, the physical impossibility test, and it ignored altogether the obstacle prong of the test. It failed to even assess whether Proposition 200 presented an obstacle to the means and ends of Federal law. Rife with these and other errors, Your Honor, the district court's denial of the preliminary injunction was an abuse of discretion. As the district court itself recognized, the only case on point says Proposition 200 is unconstitutional, the district court's grounds for distinguishing the case are wrong, and there is a substantial threat of irreparable injury and the balance of hardships tilled sharply in plaintiff's favor. Accordingly, this court has to reverse and remand. Ginsburg. Counsel, the parties were instructed to be ready to discuss standing and ripeness. Would you discuss those, please? Absolutely, Your Honor. And I was shown just minutes before I walked up here supplementary authority provided by the State to the court. There's a mistake that the State and the interveners are making with respect to ripeness. This is a facial challenge, Your Honors. This is a challenge to the constitutionality of Proposition 200, whether the State has any authority under the Supremacy Clause to engage in this type of regulation. If it is preempted by the Supremacy Clause, the State has no authority to enact this legislation one way or the other, to interpret it one way or the other. So what's your view of when a facial challenge is ripe for review? Well, Your Honor, there's two concerns with ripeness, whether the issues are fit for further factual development wouldn't significantly or in any way help the court decide the legal issues. All it would entail is requiring undocumented immigrants to actually apply for benefits, subject themselves to the threat of verification, and reporting to the Federal Government, and the legal issues would remain exactly as they are. And there's a case that I would cite to the Court's attention. It's Fireman's Fund Insurance Company v. Quackenbush, 87 F. 3rd, 290, and specifically I'm going to be quoting from page 294. It's a Ninth Circuit case from 1996, where it is alleged that a challenge provision will inevitably have an unconstitutional effect the Supreme Court has permitted review even when the impermissible consequences have not yet occurred. Here, the unconstitutional effect flows inevitably from the state's impermissible scheme to regulate immigration. And there plainly would be a hardship on the plaintiffs from delaying the case. The plaintiffs have shown that this scheme to regulate immigration is deterring immigrants from seeking benefits, even those benefits for which Federal law guarantees their eligibility. And there's no way to compensate them for the harm of emergency medical care, welfare. And the harm here is particularly acute, because we have citizen minor plaintiffs whose parents are undocumented. So the parents have been put in the untenable position of applying for the benefit and risking detection and deportation, or until somebody does apply and gets turned down, we're just being asked to write an advisory opinion, and we don't do that. Not at all, Your Honor. The statute is unconstitutional ab initio. The State has no authority to enact it. Therefore, it doesn't matter in a particular instance how it's applied or not. The threat from the impermissible State incursion into Federal authority over immigration is happening already, and it has happened already. And the harm is inevitable. It is inextricably a result of this scheme to regulate immigration. In fact, it's having precisely the effect that it was intended to, to deter immigrants from coming to or remaining in Arizona for fear of being detected and reported. What about the standing issue? Your Honor, on standing, the plaintiffs have the requisite personal stake in the outcome of this case. And there are four separate groups of plaintiffs, and I just want to point out the organization plaintiffs, Friendly House and Valle del Sol. Because Proposition 200 impermissibly regulates immigration, immigrants in Arizona are wary of contact with anyone perceived to be a State or local official. As a result, immigrants are coming to Friendly House and Valle del Sol with questions about Proposition 200 and its scope and its effect. And more important, they are seeking benefits from these organizations that they would previously have sought from the State or local agencies. So the drain on ---- How do we know that? Did we read it in the newspaper? Your Honor, on standing, the Court is supposed to accept as true all the material allegations in the complaint and construe the complaint in the light most favorable to plaintiffs. And the allegation in the complaint about the organizations is that Proposition 200's enactment and implementation would jeopardize the social services of these organizations, to the extent that ---- Suppose it's a mean-spirited, foolish law which legislatures enact from time to time. Until somebody is injured, in fact, by it, courts don't go around declaring these foolish laws unconstitutional. I think, Your Honor, that the attempt that the interveners are trying to make is to convert this facial challenge into an as-applied challenge. We don't need anyone to apply for a benefit to know how the statute is going to work. It is a pure legal question. Like a lot of other statutes, totally ignored. How do we know? It could be ignored, Your Honor, and it would still be unconstitutional, because the state has no authority to have enacted this statute in the first place. But, counsel, even to assert the unconstitutionality, there must first be standing to even come into court to complain about the unconstitutionality of the statute. So our question is, how is that for each of the groups you represent, how is that standing, which requires an injury, how is that standing supported? The injury to the organizations, as I was explaining, is the drain on and the diversion of their resources. I would cite the Supreme Court case in Havens Realty Corporation v. Coleman, 455 U.S. 363. Now, that's in the complaint that because this statute has been enacted, Friendly House has suffered a drain on its assets. I believe the actual allegation is that it would jeopardize their provision of services, and that is what the allegation is in the complaint. And if pushed to establish it ---- That's a little different than saying there's been a drain on their services because more people are coming to them for fear of going to the state system. Well, Your Honor, I would submit that this issue was never litigated below. We always have to examine our standing. Absolutely. And that's why we did that. And if it were, I can represent to the Court that this is what the allegations would have been on that issue. Let me move on to the other groups of plaintiffs. The undocumented plaintiffs, Proposition 200 subjects them to an impermissible scheme to regulate immigration. It subjects them to mandatory verification and reporting of their unlawful status. And as of today, there is no guarantee that Proposition 200, as written, won't apply even to those Federal public benefits for which they or their children are eligible. Their children, the third group, they are citizen minors. Proposition 200 subjects them and their parents to this impermissible scheme. As a result, their parents, as I said, are forced to forego benefits for which the children are eligible or risk being reported and deported. And the benefits that we're talking about, Your Honors, we have children with chronic breathing conditions. Their parents are afraid to take them to emergency, for emergency room care because of Proposition 200. And the question, Your Honors, is not whether they would have received the benefits, but whether they are willing and able to apply for the benefits, and whether Proposition 200 prevents them from applying under a constitutional process. And that's exactly the case. But how does it prevent them from applying, though, counsel? That's the problem, is in order to assert an injury in fact, in order to assert standing, there must be an injury in fact to a legally protected interest. So what is the legally protected interest that's being injured in this case? Their interest would be in applying for the state and local public benefits or Federal public benefits. There's nothing stopping them from applying. That's the problem. Without this impermissible regulation of immigration that Arizona has engaged in. What case are you relying on to support your argument that the impermissible nature of the scheme is a legally protected interest that we have to recognize? I would cite, Your Honor, to northeastern Florida chapters of the Associated General Contractors v. Jacksonville, 508 U.S. 656, 1993. Did you cite any brief? No, we did not. We prepared this in response to the Court's order. And the question. What did that case say? It was a minority set-aside program, and it was a claim of reverse discrimination. And the Court said you didn't have to show that you would have gotten the benefit, but that you were deprived of the interest in applying under a program that was constitutional. And, in effect, that's exactly what our plaintiffs have been deprived of, is the interest in applying for state, local, public benefits without having the state unconstitutionally regulate immigration. In that case, had the party sought a contract and not been awarded the contract? Your Honor, I don't recall specifically whether they are. That's generally how those cases arise, those set-aside cases, is that an unsuccessful bidder then sues to challenge the program, which is the issue that's joined here is no one has applied for benefits. So I'm not sure that case helps you very much. Well, I would say, Your Honor, that ripeness and standing merge in the sense that they depend on how imminent and inevitable the harm is. And I would emphasize that the injury and fact test says that the harm has occurred or is imminent. Here, the harm is inevitable. It is inherent in this scheme to regulate immigration. There is nothing to be gained in terms of this Court's understanding of the legal issues in having somebody apply for a benefit, get denied the benefit, have their rights violated. All it would do is enforce the scheme to regulate immigration. And this Court is in a perfect position now to adjudicate those issues without somebody having applied. Your Honors, if I may, I'd like to reserve my time for rebuttal. Thank you. Good morning. May it please the Court. My name is Mary O'Grady. I'm from the Arizona Attorney General's Office. I'm here today with Stephen Lamar and Susan Siegel, also from the Attorney General's Office, and Tim Nelson, counsel for Arizona Governor Janet Napolitano. We urge this Court to affirm the trial court's decision denying the preliminary injunction so that Arizona can continue its effort to implement this new state law. And I'd like to begin by talking about the standing and ripeness issues that were highlighted in this Court's order of June 6th. Now, this lawsuit was filed before this law ever took effect in the State of Arizona. It was filed November 30th. As of that point, the Governor had not even proclaimed this initiative into law. So we had not even had the chance to implement this new law. A TRO was issued the day the lawsuit was filed, and then December 22nd, the Court lifted the TRO, denied the preliminary injunction, and Arizona then began its effort to implement this new law in a manner consistent with its language and consistent with all constitutional requirements. None of the plaintiffs, none of the plaintiffs have been denied any benefits because of Proposition 200. They couldn't have, given the procedural status, because we weren't enforcing this when this lawsuit was filed. The citizens here have not alleged that they have not received benefits that they're entitled to. The undocumented immigrants who are plaintiffs aren't eligible for the benefits that Proposition 200 applies to, and that's established by Federal law. All we're doing in this State law is verifying the eligibility under the Welfare Reform Act that was passed in 1996. What's your response to opposing counsel's argument that there does not need to be an application because this law is being challenged on its face? Your Honor, that's not correct. There needs to be standing. There needs to be an Article III controversy. Otherwise, this Court is in the position of issuing advisory opinions. Whenever a new law is passed that people don't like, that people have concerns about, that people have questions about, that's not enough to come and invoke the jurisdiction of the Federal court and get them to block the State's effort to even get out of the gates and start implementing a new State law. They need to have standing, and here they don't. They have no actual injury. The reliance on the fear, the fear of undocumented immigrants, that they're going to be reported, and there may be consequences for that. That's not caused by anything the defendants have done. That's not caused by Proposition 200. That's inherent in the status of being in this country in violation of the Federal immigration laws. There's some fear with that, and their affidavits support that. Tammy Gregoire, the State employee who's a plaintiff, says it's already common for undocumented immigrants to be afraid to apply for assistance. That's inherent in that status. It's not caused, it's not an injury that's redressable through the relief that plaintiffs seek here. What's your response to opposing counsel's representation regarding the interests of Friendly House? Your Honor, again, that's pure speculation. There's been no, this was again filed before the State had begun implementing the law, and so we don't know what the harm. There is no actual injury to Friendly House. If immigrants are coming to them with questions, again, that to some extent is when there's a new law, a law change at the State level, at the Federal level, people may have questions. So they're going to go where they're comfortable going to get those questions answered. That doesn't get you into Federal court in a case or controversy that's appropriate for judicial intervention. I think his representation was because they no longer feel comfortable going to the State for services, they are coming to Friendly House, which burdens Friendly House's assets or resources. Your Honor, I still think that is too speculative to get Article III standing of an actual injury. And to some extent, we need to let the State continue to implement it. It may be an argument for some public outreach program, but it's certainly not an argument so people understand what Proposition 200 does, what it does not do. But it's not an argument for Article III standing to get the courts involved in adjudicating controversies that really haven't ripened. And we did file a supplemental citation of authorities the end of last week to the case of Thomas v. Anchorage Equal Rights Commission, a 2000 en banc decision from this court, which gives a helpful analysis of the standards for pre-enforcement claims and whether they are ripe for adjudication. And they set up a two-part test. First, the constitutional inquiry. Have the plaintiffs said that they're going to violate this law or engage in contact that violates this law. None of the plaintiffs have alleged that here. Have the defendants communicated a plan to bring some enforcement action of some sort against plaintiffs. Again, that's not happened here as well. And third, the court will look at the enforcement history of the particular statute. And here we haven't had a chance to develop an enforcement history because this was filed before the law even took effect in Arizona. And that's just the constitutional test for rightness. If you get past that, which plaintiffs don't in this case, you get to the prudential concerns. Is this really appropriate for judicial resolution? And what's the hardship to the parties? And I think the hardships here are similar to the preliminary injunction balancing. And on the plaintiff side, a lot of speculation, a lot of fear, a fear not necessarily caused by Proposition 200. But on the state side, we have a state law approved by our state constitutional processes. So we have probably the most fundamental interest a state could have in being able to implement its state laws. And the principles of rightness, the principles of judicial review all recognize the importance of the state being implement laws approved by the people or approved through their political processes. The presumption of constitutionality, the presumption against preemption and the federalism principles that work there. In Arizona's for official English versus Arizona, another initiative case arising out of Arizona, the United States Supreme Court, cautioned against federal courts getting involved too early in the constitutional adjudication of state statutes. All those prudential principles caution against judicial involvement at this point in Arizona's effort to implement this new state law. Are you familiar with the set-aside case that was cited by opposing counsel? I'm not, Your Honor. To the extent that I've looked at these set-aside cases in the process of the research or in the past, my recollection is similar to yours, that typically you have a frustrated bidder situation, and that's when they arise. I'm not, the cases that I've seen where you do get the pre-enforcement challenges are in the First Amendment area, when there's a potential chilling effect on free speech. But we don't have that here. We don't have that here in any way. We simply have a state law that requires that people verify eligibility for benefits. We have a pre-existing federal law that establishes that undocumented immigrants are generally not eligible for these benefits, and our implementation is absolutely consistent with the requirements of 8 U.S.C. 1621 and the related laws that established those restrictions on eligibility for benefits. The concern about emergency services, those aren't subject to, those are not state and local public benefits mandated by federal law. To the extent that federal law mandates that benefits be available without regard to immigration status, they're not verifying eligibility. They're not verifying immigration status. It's irrelevant to the eligibility termination. It is simply those benefits where federal law or another state law has established restrictions based on immigration status that they'll do that verification. If the court gets past the standing and ripeness issues that I don't think it needs to to resolve this dispute, the district court got it right in terms of the preemption analysis here. This isn't a regulation of immigration as that term has been used by the United States Supreme Court. Arizona is not attempting to determine, set the standards for who's in this country legally and who's not. The federal government sets those standards. We are simply verifying eligibility based on the existing federal standards, federal requirements. The reporting requirements are also, as the district court properly concluded, harmonious with federal law. Federal law encourages the exchange of information from state employees, from state governments to federal authorities regarding immigration status. We are simply mandating that those reports be filed. So it's not up to the individual discretion of particular state employees. If there's a discovered violation of immigration law, get the report to the federal authorities. And they're responsible for any enforcement that may occur. Similarly, with the due process challenges, again, standing and ripeness, you probably don't even need to get to these issues. But on a facial challenge, they have the burden of showing there's no circumstances under which this can be applied in a constitutional manner, and they don't meet that test. We have hearings for any applicant for benefits who's denied for whatever reason. They can appeal those determinations, and those issues will be resolved. They give reasonable notice of the requirements of this statute, and the district court made the right decision in permitting Arizona to begin its effort to implement this new state law. Unless there are further questions. It appears there are none. Thank you. We will now hear from the intervenors. Thank you, Your Honors. May it please the Court. I'm William Perry Pendley of Mountain States Legal Foundation with Jamie Shipp on brief on behalf of Randy Pullen. I want to begin, yes, on Proposition 200 and the Federal Federation of Americas for Immigration Reform. MALDEF points out in its opening brief on page 55 why this Court must dismiss this appeal. It says, quote, The only thing certain about Proposition 200, then, is that no one knows, no one knows how broadly or how narrowly it will be applied. In other words, the plaintiffs are going to have to await the knowledge that they don't have now, knowledge that they admit they don't have, and knowledge of an injury, if any, that will result from an injurious application of that law. Because right now, right now they fail to meet the requirements of Lujan, because they have not met the three prongs of Lujan. Number one, they must have a genuine threat. There is no threat. It may not be imaginary or speculative. And, in fact, as this Court has indicated in its questions, it is speculative as to how this statute will be applied. I know a little bit, Your Honor, about the Adaran case in 1995 and in 2000. I argued, and I won that case. It relates to the opportunity to bid for contractors denied contracts. And it's the question of what gives that contractor standing is the opportunity to bid on an equal footing. MALDEF is not presenting that kind of client here. The only question it is raising on behalf of the four synonyms is the question about whether or not this is indeed regulation of immigration. And it only relates to them. And what do they say? They say they might be denied benefits. They might be reported. In fact, they might even be deported. But those are only conjectural and speculative. Moreover, the second prong is not met. The denial of benefits, the reporting, the deporting, will result from Federal law, that is, 8 U.S.C. 1621, 8 U.S.C. 1625, because it is that law that authorizes the State of Arizona to ascertain and require an applicant for public benefits to provide proof of eligibility. The third prong is not met. The third prong is if this Court, heaven forbid, were to strike Proposition 200, would that solve MALDEF's problem and its clients' problems? Absolutely not, because unilaterally any State agency might say, well, I'm authorized by 1625 to start asking for evidence of eligibility. I'm going to start asking for that. Moreover, as one examines MALDEF's opening brief, pages 27 to 31, the very complex analysis of the hypothetical violations of the INA that it proposes demonstrates why this is an improper challenge and no one has standings. The question should be how are bureaucrats actually applying this law, not how might they apply it at some future time. And as one examines at page 51 to 55 of the opening brief, they demonstrate in all their discussion of what the benefit definition might be. Once again, this is totally conjectural, as they conclude on page 55. Now, the question isn't right. Moreover, they don't have standing. But even if they did, Federal law allows States and Arizona to ask these questions. Federal law allows States to say, demonstrate that you're eligible. Moreover, Federal law says you may not bar your employees from seeking information from the INS and obtaining information from the INS. In other words, MALDEF is seeking today from this Court, just as it sought last December from the District Court, an order saying that, an order that the Arizona legislature and its governor could not adopt. That is an order saying, no, you may not ask for evidence of eligibility. And, yes, you may bar State employees from obtaining information. Furthermore, MALDEF is wrong when it says, quote, that this is, that Proposition 200 is, quote, a comprehensive scheme to detect and report the presence and effect the removal of illegal aliens. That's the touchstone here. That's what their entire case turns around. Is this such a scheme? But it is not such a scheme. Look at what Proposition 200 simply is. Proposition 200 simply is this, an attempt by the State to deal with three problems that it has ascertained. First of all, at Section 2 of Proposition 200, illegal immigration is causing economic hardship. Number two, illegal immigration is encouraged by public agencies that provide public benefits without verifying eligibility, and three illegal immigrants have been given a safe haven in the State. That's all Proposition seeks to address. The assignment, the award of public benefits, and the inducement it provides on illegal immigration. What happens to the people illegally here, Arizona recognizes in Proposition 200, is totally up to the Office of Homeland Security and the INS. I want to urge the Court caution with regard to some of the language MALDEF uses in its brief. For example, MALDEF points out that Proposition 200 is involved in a debate, a determination of legal and illegal. That is not the language of Proposition 200. The language of Proposition 200 would be the question asked by Proposition 200 is more properly eligible and ineligible. But moreover, the question about legal and illegal is a question that Congress has made the determination is permitted under 8 U.S.C. 1644. Let me close by discussing the Dukakis case, which is the touchstone case, the Supreme Court case, and the three questions asked there. Number one, is this a regulation of immigration? And the district court found correctly it is not a regulation of immigration. It certainly is not a regulation of immigration because what the Supreme Court said is the regulation of immigration, a determination as to who may come in and the circumstances under which they may stay. Arizona makes no such determination under Proposition 200. Moreover, and this is a position taken by the Supreme Court, it enunciated once again as recently as April the 27th of this year in the Batesford Dow Chemical or Dow Pharmaceutical case, Congress must demonstrate by clear and manifest evidence its complete ouster of the State. When one looks at 1625 and 1644, that is, the authorization to the State to ask for eligibility evidence and the instruction to the State, don't prevent your employees from finding out immigration status, it is clear it's not a complete ouster by Congress. Congress could have ousted the State. It did not. And the third test, and it's a two-part test, is it impossible to comply with both? The district court found it was not impossible. That's a proper test under Michigan Cantor's 1984 test case. And finally, is it an obstacle to the accomplished quote of the full purposes and objectives of Congress? What are those full purposes and objectives by Congress? Well, as Congress said in Section 1601, 8 U.S.C. 1601, we want to reduce the draw on illegal immigration that is caused by the illegal and impermissible payment of welfare benefits to people illegally in this country. That's totally consistent. What Proposition 200 is doing is totally consistent with what Congress has decided it wants to have done in this country. Remember, there was tremendous controversy over the adoption of the public response, Personal Responsibility and Work Opportunity Reconciliation Act of 1996. It was vetoed twice, and it passed by wide margins. Finally, then President Clinton signed it into law. Proposition 200 seeks to accomplish what Congress clearly demonstrated it would have been accomplished by the states as well as by federal agencies, and it did so in a way consistent with the 10th Amendment. As this Court knows, of course, Congress could not have directed state employees to engage in these activities, but it certainly opened the door to permit them to do so. Let me close finally by saying this. MALDEF seeks this Court to do what the state legislature and the governor could not do. That is to tell state agencies that they may not ask for proof of eligibility and to tell state agencies they cannot send to and receive from the IRS information regarding the immigration status, legal or illegal, of aliens in the United States. Thank you very much. Thank you, counsel. Rebuttal. Your Honors, I'll keep it brief. I think it's important to make clear here that we are not trying to argue to permit all facial pre-enforcement challenges, but there are unique features to Proposition 200 that this Court has to consider. One is that we are asserting a preemption claim. The statute is unconstitutional because the State had no power to enact it, and the constitutional violation is inherent in any application of the statute. Well, what specifically does the statute authorize or require that is contrary to the Federal immigration law, which you say preempts the power of the State to act at all in this field? As I said, Your Honor, earlier, the district court said that if it was going to follow LEW Act I, it would hold that Proposition 200 is unconstitutional because it creates a scheme to detect, report the presence of, and effect the removal of illegal aliens. And the district court was absolutely right about that. And its grounds for distinguishing LEW Act I, as I said earlier, are wrong. It looked to Federal law to say that Arizona is permitted to enact statutes like Prop 200. That's completely wrong. If it is regulation of immigration, the State has no authority to enact it. Why can't a State instruct its officers and agencies to pass through information to the Federal government and let the Federal government decide whether to act upon that pass-through information? Well, Your Honor, what is the constitutional problem here is that it is not just state and local employees on pain of criminal sanction report violations of Federal law that they discover. They have no authority under Federal law to investigate or to adjudicate or to determine violations of Federal law. They are completely overstepping Congress's power over immigration and And is passing information along, is that, that isn't making any judgment about whether the people are illegal or not. It's just saying here's a person who has no documents and is wanting certain benefits. But that's not what the process is. Pass that information along. What's wrong with that? The initiative requires reporting any violation of Federal immigration law. And to have state and local employees determine violations of Federal immigration law necessarily implicates them in the regulation of immigration. The only purpose and effect of reporting people to the Federal government who have violated supposedly Federal law is to have them deported, to set the deportation purpose of that is to reduce the number of people who are claiming benefits which the State has to fund and administer when they're not entitled to those benefits. If the State's interest were in ensuring that only those people who are eligible for benefits get them, it wouldn't have devised this system. This system doesn't require verification of eligibility. And what's interesting is there's been a lot of citation to 8 U.S.C. 1625. 1625 says States are authorized to require proof of eligibility. Proposition 200 verifies the immigration status of each and every applicant, whether the status would make the person eligible or not. It is overbroad. It goes far beyond any purpose of determining benefits eligibility to root out people who are undocumented so as to then be able to report them for being in violation of Federal law. That is regulation of immigration, Your Honor. That goes far beyond and has no relation to benefits eligibility. And I can cite to you, and this is a very important distinction between verifying immigration status and verifying benefits eligibility. The Department of Justice issued guidance to agencies administering public benefits. The guidance says agencies have to ask the applicant to provide documentation of his or her status as qualified. Basically show us that you are a citizen, you are a qualified alien or a nonimmigrant or somebody paroled for less than one year. It doesn't say that the agency is to determine the immigration status of every applicant, whether or not they even attempt to proffer an immigration status that would make them eligible. To the contrary, it says there's no reason to check with the INS if the applicant claims a status that would not make them eligible. From a benefits eligibility perspective, you ask somebody to prove that they are eligible. If they can't, that's the end of the process. Prop 200 doesn't stop there. It goes at their immigration status and it goes at this issue of whether they are in violation of Federal The only conceivable purpose for this scheme, this interlocking scheme of being too broad on the front side and reporting people on the back end is to be able to detect, report the presence of, and effect the removal of undocumented immigrants in this country. And that is, Your Honors, the unconstitutional regulation of immigration. Thank you, counsel. Thank you to both counsel for your argument. The case just argued is submitted for decision by the court, and this court is in recess until 9 o'clock a.m. tomorrow morning. Thank you.
judges: Goodwin, Reavley , Rawlinson